Scott R. Mosko (State Bar No. 106070)
scott.mosko@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
Stanford Research Park
3300 Hillview Avenue
Palo Alto, California  94304-1203
Telephone:  (650) 849-6600
Facsimile:   (650) 849-6666

B. Brett Heavner (*pro hac vice* application to be filed)
brett.heavner@finnegan.com
Margaret Esquenet (*pro hac vice* application to be filed)
margaret.esquenet@finnegan.com
Naresh Kilaru (*pro hac vice* application to be filed)
naresh.kilaru@finnegan.com
FINNEGAN, HENDERSON, FARABOW,
    GARRETT & DUNNER, LLP
901 New York Avenue, NW
Washington, DC 20001
Telephone:  (202) 408-4000
Facsimile:   (202) 408-4400

Attorneys for Defendant
AMERICAN PETROLEUM INSTITUTE

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN JOSE DIVISION

| | |
|---|---|
| CHOOSE ENERGY, INC., <br><br> Plaintiff, <br><br> v. <br><br> AMERICAN PETROLEUM INSTITUTE, <br><br> Defendant. | Case No. 5:14-cv-04557-PSG <br><br> **DEFENDANT AMERICAN PETROLEUM INSTITUTE'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** <br><br> Date:  October 28, 2014 <br> Time: 10:00 a.m. <br> Courtroom 5, 4th Floor <br> Judge:   Honorable Paul S. Grewal |

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ................................................................................................. 1

II.     FACTUAL BACKGROUND .............................................................................. 2

III.    ARGUMENT ....................................................................................................... 5

      A.      Plaintiff Is Not Likely to Succeed on the Merits of Its
          Trademark Infringement Claim ............................................................... 7

          1.      Because API Does Not Use "Choose Energy," "I
               choose energy," or "chooseenergy.org" Commercially
               In Connection With Any Product or Service, API's Use
               Does Not Fall Within the Purview of the Lanham Act ................. 7

          2.      Even Assuming Commercial Use, API's Use of
               "Choose Energy," "I choose energy," and
               "chooseenergy.org" Constitutes Descriptive Fair Use .................. 9

          3.      Plaintiff Is Unlikely to Establish a Likelihood of
               Confusion ................................................................................... 10

               a.      Plaintiff's CHOOSEENERGY Mark Is Weak
                    and Entitled to an Extremely Limited Scope of
                   Protection ............................................................... 11

               b.      The Parties Do Not Offer Any Related Services ............ 13

               c.      When Viewed in Context, API's Use of
                   "Choose Energy," "I Choose Energy," and
                   "chooseenergy.org" as a Political Messaging
                   Tool Is Not Similar to Plaintiff's
                   CHOOSEENERGY Mark ....................................... 14

               d.      The Fact That Both Parties Utilize the Internet
                   Is Not Sufficient to Find That the Marketing
                   Channels Are the Same ........................................ 15

               e.      Plaintiff's Evidence of Actual Confusion Is
                   Based Entirely on Hearsay and Is Highly
                   Unreliable ............................................................. 16

               f.      API Had No Intent to Capitalize on Plaintiff's
                   Reputation or to Confuse Consumers .......................... 19

      B.      Plaintiff Will Not Suffer Irreparable Harm ........................................... 19

      C.      The Balance of Hardships Tips Sharply in API's Favor .......................... 19

      D.      Public Policy Does Not Favor A TRO or Injunction in This
          Case ....................................................................................................... 23

III.    PLAINTIFF'S REQUEST FOR A HEARING ON OCTOBER 28, 2014 DOES NOT COMPLY WITH THE LOCAL RULES AND SHOULD BE DENIED ........................................................................................23

IV.    CONCLUSION AND REQUEST FOR EVIDENTIARY HEARING ...............................24

API'S OPP'N TO MOTION FOR TRO
Case No. 5:14-cv-04557-PSG

1

## TABLE OF AUTHORITIES

2

3                                                                    **Page(s)**

4    **Federal Cases**

5    *Accuride Int'l, Inc. v. Accuride Corp.*,
          871 F.2d 1531 (9th Cir. 1989) ...................................................................16

6
7    *Alliance for the Wild Rockies v. Cottrell*,
          632 F.3d 1127 (9th Cir. 2011) .....................................................................5

8    *American Univ. of Antigua College of Medicine v. Woodward*,
          837 F.Supp.2d 686 (E.D. Mich. 2011)........................................................9

9
10   *AMF, Inc. v. Sleekcraft Boats*,
          599 F.2d 341 (9th Cir. 1979) ................................................................11, 14

11
12   *Arcamuzi v. Continental Air Lines, Inc.*,
          819 F.2d 935 (9th Cir. 1987) .......................................................................5

13   *Aurora World, Inc. v. TY Inc.*,
          719 F. Supp. 2d 1115 (C.D. Cal. 2009) .....................................................19

14
15   *Bayer Corp. v. Roche Molecular Sys.*,
          72 F. Supp. 2d 1111 (N.D. Cal. 1999) .......................................................22

16   *Bell v. Harley Davidson Motor Co.*,
          539 F. Supp. 2d 1249 (S.D. Cal. 2008).....................................................10

17
18   *Bosley Medical Inst. v. Kremer*,
          403 F.3d 672 (9th Cir. 2005) .......................................................................8

19
20   *Carroll v. President & Comm'rs of Princess Anne*,
          393 U.S. 175 (1968).....................................................................................6

21
22   *Century Theatres, Inc. v. Landmark Theatres Corp.*,
          2000 U.S. Dist. LEXIS 10693 (N.D. Cal. Apr. 12, 2000) ..........................9

23   *CG Roxane LLC v. Fiji Water Co. LLC*,
          569 F. Supp. 2d 1019 (N.D. Cal. 2008) ......................................................9

24
25   *Coen Co. v. Pan Int'l, Ltd.*,
          2014 U.S. Dist. LEXIS 110027 (N.D. Cal. Aug. 8, 2014)..........................5

26   *Cosmetically Sealed Indus. v. Chesebrough-Pond's USA Co.*,
          125 F.3d 28 (2d Cir. 1997)...........................................................................9

27

28

*CPC Int'l., Inc. v. Skippy Inc.,*
   214 F.3d 456 (4th Cir. 2000) ....................................................................................8

*Delphon Indus., LLC v. Int'l Test Solutions Inc.,*
   2011 U.S. Dist. LEXIS 119588 (N.D. Cal. Oct. 17, 2011)....................5, 18, 19, 20

*eBay, Inc. v. MercExchange, LLC,*
   547 U.S. 388 (2006)........................................................................................19, 20

*Eichner v. Bank of America,*
   2013 U.S. Dist. LEXIS 118984 (N. D. Cal. August 20, 2013)...............................24

*Eli Lilly and Co. v. Revlon, Inc.,*
   577 F. Supp. 477 (S.D.N.Y. 1983).........................................................................10

*First National Bank of Boston v. Bellotti,*
   435 U.S. 765 (1978)...............................................................................................23

*Givemepower Corp. v. Pace Compumetrics, Inc.,*
   No. 07CV157WQHRBB, 2007 WL 951350 (S.D. Cal. Mar. 23, 2007) ................21

*Granny Goose Foods, Inc. v. Teamsters,*
   415 U.S. 423, 94 S. Ct. 1113, 39 L. Ed. 2d 435 (1974)..........................................6

*Herbalife Int'l, Inc. v. Lumene N. Am. LLC,*
   CV 07-5040 AHM (RCX), 2007 WL 4225776 (C.D. Cal. Oct. 15, 2007).............15

*Int'l Bancorp, LLC v. Societe des Bains de Mer et*........................................................7

*Kerr Corp. v. North Am. Dental Wholesalers, Inc.,*
   2011 U.S. Dist. LEXIS 61779 (C.D. Cal. June 9, 2011) .......................................19

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,*
   543 U.S. 111 (2004)...............................................................................................18

*Lucasfilm Ltd. v. High Frontier,*
   622 F.Supp. 931 (D.D.C. 1985).............................................................................9

*Marin Alliance For Med. Marijuana v. Holder,*
   866 F. Supp. 2d 1142 (N.D. Cal. 2011) ................................................................21

*Mazurek v. Armstrong,*
   520 U.S. 968 (1997)................................................................................................5

*Miss World (UK), Ltd. v. Mrs. America Pageants, Inc.,*
   856 F.2d 1445 (9th Cir. 1988) .........................................................11, 12, 14, 18

*Network Automation, Inc. v. Advanced Sys. Concepts, Inc.,*
   638 F.3d 1137 (9th Cir. 2011) ...............................................................................15

*New Orleans Steamship Ass'n v. General Longshore Workers, ILA Local 1418*,
    626 F.2d 455 (5th Cir. 1980) ............................................................8

*Nissan Motor Co. v. Nissan Computer Corp.*,
    378 F.3d 1002 (9th Cir. 2004) ..........................................................8

*Nutrition 21 v. United States*,
    930 F.2d 867 (Fed. Cir. 1991).........................................................20

*Organization for a Better Austin v. Keefe*,
    402 U.S. 415 (1971)...................................................................8, 22

*Pacific Gas & Elec. Co. v. Public Util. Comm'n*,
    475 U.S. 1 (1986) ............................................................................23

*Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*,
    469 U.S. 189 (1985) .......................................................................18

*Quia Corp. v. Mattel, Inc.*,
    2010 U.S. Dist. LEXIS 68237 (N.D. Cal. June 15, 2010) ...................13, 14, 15, 19

*QVC Inc. v. Your Vitamins Inc.*,
    439 F. App'x 165 (3d Cir. 2011) (unpublished decision)..................18

*Rearden LLC v. Rearden Commerce, Inc.*,
    683 F.3d 1190 (9th Cir. 2012) ........................................................16

*Reno Air Racing Ass'n, Inc. v. McCord*,
    452 F.3d 1126 (9th Cir. 2006) .......................................................6, 7

*Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*,
    907 F. Supp. 2d 1086 (N.D. Cal. 2012) ...........................................7

*Savannah College of Art and Design, Inc. v. Houeix*,
    369 F.Supp.2d 929 (S.D. Ohio 2004) ..............................................9

*Shelley v. Kraemer*,
    334 U.S. 1 (1948)......................................................................8, 22

*Skydive Ariz., Inc. v. Quattrocchi*,
    2010 U.S. Dist. LEXIS 49972 (D. Ariz. Apr. 26, 2010).................20

*Taubman Co. v. Webfeats*,
    319 F.3d 770 (6th Cir. 2003) ..........................................................8

*Tax Cap Committee v. Save Our Everglades, Inc.*,
    933 F. Supp. 1077 (S.D. Fla. 1996) .................................................8

*Therma-Scan, Inc. v. Thermoscan, Inc.*,
    295 F.3d 623 (6th Cir. 2002) .........................................................13

*TMI, Inc. v. Maxwell*,
   368 F.3d 433 (5th Cir. 2004) ...............................................................8

*United Tactical Systems, LLC v. Real Action Paintball, Inc.*,
   2014 U.S. Dist LEXIS 142864 (No. Dist. Cal. October 6, 2014)...........................21

*Water Pik, Inc. v. Med-Systems, Inc.*,
   726 F.3d 1136 (10th Cir. 2013) ...........................................................13

*Webceleb, Inc. v. Procter & Gamble Co.*,
   554 F. App'x 606 (9th Cir. 2014) (unpublished opinion)...................................10

*Winter v. Natural Res. Def. Council, Inc.*,
   555 U.S. 7 (2008)...........................................................................5

*Wonder Labs, Inc. v. Procter & Gamble Co.*,
   728 F. Supp. 1058 (S.D.N.Y. 1990)..........................................................10

**Federal Statutes**

15 U.S.C. § 1065..............................................................................11

15 U.S.C. § 1114(1)(a)........................................................................7

15 U.S.C. § 1115(b)(4)........................................................................9

Internal Revenue Code § 501(c)(6)............................................................17

**State Statutes**

Lanham Act...............................................................................*passim*

Lanham Act, § 45.............................................................................7

**Rules**

Fed. R. Civ. P. 65(b)(1).....................................................................6

Federal Rule of Civil Rule 65(c)............................................................23

**Constitutional Provisions**

First Amendment .......................................................................1, 2, 22, 23

**Other Authorities**

S. Rep. No. 100-515, at 44 (1988), *reprinted in* 1988 U.S.C.C.A.N. 5577....................7

1

## I.    INTRODUCTION

2

Plaintiff's attempt to shut down the use of the descriptive terms "Choose Energy" and "I

3

Choose Energy" by Defendant American Petroleum Institute ("API"), which API has been using for

4

political issue-advocacy messaging for almost a year, should be denied.  A temporary restraining

5

order to silence political speech protected by the First Amendment on the eve of Election Day is an

6

extraordinary remedy that is justified, if ever, only in extremely rare circumstances.  Plaintiff has not

7

articulated any such extraordinary circumstances here.

8

Since January 2014, API has used the phrases "Choose Energy" and "I Choose Energy" in

9

their primary descriptive sense as part of its issue-advocacy and voter education campaign activities

10

for the November 2014 election.  In the context of such political messaging, "choose" is

11

synonymous with "vote for."  Thus, the plain meaning of API's messaging is that people should vote

12

for particular positions and candidates that support forward-looking energy policies.  This is pure

13

political speech protected by the First Amendment, and not substantively different from using

14

"Choose Energy" or "I Choose Energy" as the title of a book or the publication of an editorial about

15

pro-energy issues.  Because one of the requirements for a trademark infringement claim under the

16

Lanham Act is that the defendant use the allegedly infringing mark "*in commerce*... in connection

17

with the *sale, offering for sale, distribution, or advertising of any goods or services*," Plaintiff has

18

not (and cannot) state a valid infringement claim and its motion should be denied for this reason

19

alone.  API offers no goods or services in connection with its "Choose Energy" and "I Choose

20

Energy" messaging, which in context can only be considered non-commercial, political speech.

21

Even assuming API used the terms "Choose Energy" and "I Choose Energy" commercially

22

in connection with some product or service (which it does not), those terms are unlikely to cause

23

confusion with Plaintiff's CHOOSEENERGY trademark for a number of reasons.  Perhaps most

24

significantly, the mark CHOOSEENERGY is inherently weak for brokerage services that allow

25

consumers to *choose* an *energy* provider from which to purchase electricity.  As such, the scope of

26

protection the Plaintiff's mark should be afforded is extremely narrow, and the differences between

27

Plaintiff's energy brokerage services and API's issue-advocacy speech are more than sufficient to

28

avoid any likelihood of confusion.

1    Moreover, a hallmark of irreparable injury is urgency and the inadequacy of money damages.

2    API has been publicly using the phrases "Choose Energy" and "I Choose Energy" on a national scale

3    since January 2014.  Based on the chat transcript between Plaintiff and one of its customers (*see* Dkt.

4    No. 1, Pl.'s Compl. at ¶27), Plaintiff has been aware of the factual basis for its claims since at least

5    as early as September 6, 2014—more than 7 weeks ago.  Tellingly, Plaintiff fails to admit how much

6    earlier it knew about API's use of these phrases.  Indeed, the questionable delays between (a) the

7    filing of the complaint and the filing of this Motion (14 days), (b) the filing of the complaint and the

8    date Plaintiff forwarded even a courtesy copy of the complaint to API's counsel with whom Plaintiff

9    had already been communicating (5 days), and (c) the filing of the Motion and the date Plaintiff

10   forwarded a copy of the Motion to API's counsel, proves that the drastic remedy of a TRO is

11   inappropriate.

12       Further, without revealing the details of the settlement discussions between the parties, the

13   essence of the dispute between the parties is not whether Plaintiff cares if API continues to exercise

14   its First Amendment Rights by using these above-stated phrases until the November 4, 2014

15   election.  Instead, the issue boils down to how much money Plaintiff insists that API pay for the

16   exercise of such rights.

17       And, the balance of hardships also clearly favors API.  A temporary restraining order would

18   shut down API's Constitutionally-protected political advocacy during the critical week before

19   Election Day.  By comparison, any harm to Plaintiff is minimal given that API has already informed

20   Plaintiff that this advocacy effort will end November 4, 2014 (i.e., in another eight days) and that

21   API does not intend to use the message again.

22       Finally, it would not be in the public interest to grant the extreme relief Plaintiff requests.  A

23   TRO or injunction would be wholly disproportionate to Plaintiff's proof and would serve only to

24   deprive voters of hearing API's viewpoints.

25       For all of these reasons, Plaintiff's motion should be denied.

26   **II.    FACTUAL BACKGROUND**

27       API is the leading trade association for the petroleum and natural gas industry in the United

28   States.  API was established to afford a means of cooperation between the industry and the

1   government in matters of national concern, foster foreign and domestic trade in American petroleum

2   products, and promote the interests of the petroleum industry.  To advance these goals, API has for

3   decades engaged in political messaging activities to advocate the collective views of its members

4   and the petroleum industry as a whole.  (Decl. of Linda Rozett, hereinafter "Rozett Decl." ¶ 3)

5        For almost a year, API has used the phrases "Choose Energy" and "I choose energy" as part

6   of a political messaging strategy designed to educate voters and encourage them to participate in the

7   energy conversation around the election and to elect official who support energy initiatives.  The

8   sole purpose of this messaging has been to "[e]ducate Americans on key energy issues so that they

9   can make better choices at the ballot box, connect them with candidates for elected office, and build

10  the 'energy vote' leading up to Election Day—November 4, 2014."  (Rozett Decl. ¶ 5)  To this end,

11  API provides information to voters regarding the oil and natural gas industry, Get Out the Vote voter

12  registration materials, state-by-state information regarding natural gas and oil production, and other

13  information regarding how energy issues will affect the November 4, 2014 election.  *Id*. at ¶ 6.

14       As shown in the image below, which is taken from API's "choosenergy.org" website, API's

15  use of the terms "Choose Energy" and "I choose energy" are clearly part of a political message and

16  are not used to identify or promote any particular product or service:

17

18

19

20

21

22

23

24

25

26

27

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18





19    When viewed in context, particularly with the words "Choose Energy" appearing inside the

20 image of a campaign button and the text "THIS ELECTION, Americans have the opportunity to

21 choose candidates who support energy policies that create jobs, enhance our energy security and

22 establish America as a global energy leader" appearing immediately underneath the message, it is

23 clear that API's use of the terms "Choose Energy" and "I choose energy" are part of a purely

24 political message intended to garner support for pro-energy candidates.  These terms are not used as

25 trademarks to identify any particular product or service.  (*Id*. at ¶ 10)  This lack of trademark use is

26 evidenced by the fact that API does not attach the ™ symbol to the "Choose Energy" phrasing (but it

27 does include the ® symbol next to the API mark).  The exclusively political nature of the message is

28

1  further underscored by the fact that API will be ceasing all messaging activities using these terms

2  after the election on November 4, 201.  (*Id*. at ¶  14).

3  **III.    ARGUMENT**

4          As a form of preliminary injunctive relief, a temporary restraining order is "an extraordinary

5  remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

6  In order to succeed on its motion for a TRO or any subsequent motion for a preliminary injunction,

7  Plaintiff must establish (1) that it is likely to succeed on the merits; (2) that it is likely to suffer

8  irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in its favor;

9  and (4) that an injunction is in the public interest.  *Id.* at 20; *Coen Co. v. Pan Int'l, Ltd.*, 2014 U.S.

10  Dist. LEXIS 110027, *12 (N.D. Cal. Aug. 8, 2014) ("The same legal standard applies to a motion for

11  a temporary restraining order and a motion for a preliminary injunction.").

12          The Ninth Circuit analyzes the four elements using a "sliding scale" approach, in which the

13  elements of the test are balanced, "so that a stronger showing of one element may offset a weaker

14  showing of another." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011).

15  In all cases however, preliminary injunctive relief requires "a significant threat of irreparable

16  injury." *Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir. 1987); *see also*

17  *Delphon Indus., LLC v. Int'l Test Solutions Inc.*, 2011 U.S. Dist. LEXIS 119588, *9-10 (N.D. Cal.

18  Oct. 17, 2011) ("Courts have consistently identified a showing of likely irreparable harm as the

19  single most important prerequisite for the issuance of a preliminary injunction… Even if a plaintiff

20  establishes a likelihood of success on the merits, the absence of a substantial likelihood of

21  irreparable injury would, standing alone, make preliminary injunctive relief improper.") (citations

22  omitted).

23          Significantly, the moving party must also make a "clear showing" that it is entitled to

24  preliminary relief.  *Winter*, 555 U.S. at 22; *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997)

25  (holding that a preliminary injunction "should not be granted unless the movant, *by a clear showing,*

26  carries the burden of persuasion") (emphasis in original) (citation omitted).  Where, as here, the

27  request for injunctive relief seeks to silence speech protected by the First Amendment, it is subject to

28

1   an even higher standard, and, if granted, must be narrowly tailored to achieve a legitimate

2   government purpose. *Carroll v. President & Comm'rs of Princess Anne*, 393 U.S. 175, 184 (1968).

3          A TRO may be issued without notice to the adverse party or its counsel only if: "(A) specific

4   facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss,

5   or damage will result to the movant before the adverse party can be heard in opposition; and (B) the

6   movant's attorney certifies in writing any efforts made to give notice and the reasons why it should

7   not be required." Fed. R. Civ. P. 65(b)(1). Civil Local Rule 65-1(b) provides that "[u]nless relieved

8   by order of a Judge for good cause shown, on or before the day of an ex parte motion for a

9   temporary restraining order, counsel applying for the temporary restraining order must deliver notice

10  of such motion to opposing counsel or party."

11         The United States Supreme Court has explained that the circumstances justifying the

12  issuance of an ex parte temporary restraining order are extremely limited: The stringent restrictions

13  imposed by Rule 65 on the availability of ex parte temporary restraining orders reflect the fact that

14  our entire jurisprudence runs counter to the notion of court action taken before reasonable notice and

15  an opportunity to be heard has been granted both sides of a dispute. Ex parte temporary restraining

16  orders are no doubt necessary in certain circumstances, but under federal law they should be

17  restricted to serving their underlying purpose of preserving the status quo and preventing irreparable

18  harm just so long as is necessary to hold a hearing, and no longer. *Granny Goose Foods, Inc. v.*

19  *Teamsters*, 415 U.S. 423, 438-39, 94 S. Ct. 1113, 39 L. Ed. 2d 435 (1974) (internal citation omitted).

20         Consistent with the overriding concern articulated by the Supreme Court, the Ninth Circuit

21  has stated that there are "very few" circumstances justifying the issuance of an ex parte TRO. *Reno*

22  *Air Racing Ass'n, Inc. v. McCord*, 452 F.3d 1126, 1131 (9th Cir. 2006). For instance, notice may be

23  excused where it "is impossible either because the identity of the adverse party is unknown or

24  because a known party cannot be located in time for a hearing." *Id*. Or, notice may not be required

25  where providing "notice to the defendant would render fruitless the further prosecution of the action"

26  because the adverse party is likely to destroy evidence. *Id*.

27         In the context of trademark infringement, such cases include situations where an alleged

28  infringer is likely to dispose of the infringing goods before the hearing. *Reno Air*, 452 F.3d at 1131.

1    To justify an ex parte proceeding on this ground, "the applicant must do more than assert that the

2    adverse party would dispose of evidence if given notice." *Id.* "A plaintiff must show that defendants

3    would disregard a court order and dispose of the goods within the time it would take for a hearing

4    and must support such assertions by showing that the adverse party has a history of disposing of

5    evidence or violating court orders or that persons similar to the adverse party have such a history."

6    *Rovio Entm't Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1094 (N.D. Cal. 2012).

7         As discussed below, Plaintiff falls far short of its evidentiary burden to obtain the requested

8    relief, which is extreme and inappropriate in view of the trivial nature of Plaintiff's proof.

9    **A.    Plaintiff Is Not Likely to Succeed on the Merits of Its Trademark**
     **Infringement Claim**

10

11   **1.    Because API Does Not Use "Choose Energy," "I choose**
         **energy," or "chooseenergy.org" Commercially In Connection**
         **With Any Product or Service, API's Use Does Not Fall Within**
12       **the Purview of the Lanham Act**

13        Plaintiff's complaint fails to state a claim upon which relief can be granted because it fails to

14   allege that API is using "Choose Energy," "I choose energy," or "chooseenergy.org" in connection

15   with the sale of any goods or services, as required by the Lanham Act.  Plaintiff has made no such

16   allegation—and could make no such allegation even if given an opportunity to amend—because it

17   knows that API's use of these terms is pure political speech that has no commercial function.

18        A federal trademark infringement claim may only be brought where the allegedly infringing

19   terminology is being used "*in commerce . . . in connection with the sale, offering for sale,*

20   *distribution, or advertising of any goods or services* on or in connection with which such use is

21   likely to cause confusion, or to cause mistake, or to deceive."  15 U.S.C. § 1114(1)(a) (emphasis

22   added). Without "use in commerce" "in connection with goods and services," there is no trademark

23   infringement.  *Int'l Bancorp, LLC v. Societe des Bains de Mer et deu Cercle Des Estrangers A*

24   *Monaco, LLC*, 329 F.3d 359, 363 (4th Cir. 2003).  The legislative history of the Lanham Act

25   confirms the commercial use requirement.  S. Rep. No. 100-515, at 44 (1988), *reprinted in* 1988

26   U.S.C.C.A.N. 5577, 5607 ("Amendment of the definition of 'use in commerce' [in § 45 of the

27   Lanham Act) is one of the most far-reaching changes the legislation contains. . . . The committee

28   intends that the revised definition of 'use in commerce' be interpreted to mean *commercial use*

1   which is typical in a particular industry.").  The Lanham Act simply excludes all noncommercial

2   speech.  *Nissan Motor Co. v. Nissan Computer Corp.*, 378 F.3d 1002, 1017 (9th Cir. 2004); *see also*

3   *TMI, Inc. v. Maxwell*, 368 F.3d 433, 436-38 (5th Cir. 2004).  Noncommercial speech is not subject to

4   the Lanham Act or trademark law, and is guaranteed complete and full First Amendment protection.

5   *See Nissan Motor Co.*, 378 F.3d at 1015-18; *Taubman Co. v. Webfeats*, 319 F.3d 770, 774-75 (6th

6   Cir. 2003).[1]

7          The question of commercial use is straightforward:  is the defendant's alleged use of the

8   plaintiff's alleged mark "in connection with the sale of goods or services," and more specifically,

9   does the defendant "offer[] *competing* services to the public."  *Bosley Medical Inst. v. Kremer*, 403

10  F.3d 672, 679 (9th Cir. 2005) (dismissing plaintiff's trademark infringement claims on the ground

11  that defendant's commentary-based website which hosted no advertising and had no direct links to

12  any commercial websites was not "a use in connection with a good or service"); *Nissan Motor Co.*

13  378 F.3d 1002, 1017 ("[T]he core notion of commercial speech is that it does no more than propose

14  a commercial transaction.")  Here, the unequivocal answer is no.  API's use of "Choose Energy" and

15  "I Choose Energy" to persuade voters to "elect officials at every level of government" who support

16  pro-energy policies (Rozett Decl. ¶  5) is clearly political, rather than commercial, speech.  Just as

17  the commentary-based website found to be non-commercial in *Bosley Medical*, API's

18  "chooseenergy.org" website contains no advertisements or links to any commercial website, does not

19  offer any products or services for sale, and confers no financial benefit to API. (Rozett Decl. ¶  13)

20         No aspect of API's political messaging, including the chooseenergy.org website, meets the

21  Lanham Act's definition of "use in commerce."  See *Tax Cap Committee v. Save Our Everglades,*

22  *Inc.,* 933 F. Supp. 1077, 1080-81 (S.D. Fla. 1996) (holding that Lanham Act was not applicable

23  because where a party was not seeking to establish an identity, to raise funds, or to attract members,

24

25  ---
    [1] Although Plaintiff is a private party, its action against API implicates the First Amendment
26  because the relief it seeks, if granted, is considered governmental action subject to First Amendment
    scrutiny.  *Shelley v. Kraemer*, 334 U.S. 1, 14-15 (1948); *Organization for a Better Austin v. Keefe*,
27  402 U.S. 415, 418 (1971); *CPC Int'l., Inc. v. Skippy Inc.*, 214 F.3d 456, 461 (4th Cir. 2000); *New*
    *Orleans Steamship Ass'n v. General Longshore Workers, ILA Local 1418*, 626 F.2d 455, 462 (5th
28  Cir. 1980).

- 8 -

1    there is no use in commerce); *see also Lucasfilm Ltd. v. High Frontier*, 622 F.Supp. 931, 934

2    (D.D.C. 1985) ("Defendants' only activity is trying to communicate their ideas.  Purveying points of

3    view is not a service.").  *See also American Univ. of Antigua College of Medicine v. Woodward*, 837

4    F.Supp.2d 686, 692 (E.D. Mich. 2011) (stating use of mark on website that does not sell, distribute

5    or advertise any goods or services is not commercial use); *Savannah College of Art and Design, Inc.*

6    *v. Houeix*, 369 F.Supp.2d 929, 942-48 (S.D. Ohio 2004) (same).

7                  **2.      Even Assuming Commercial Use, API's Use of "Choose Energy,"**
                            **"I choose energy," and "chooseenergy.org" Constitutes**
8                            **Descriptive Fair Use**

9            Even assuming for the sake of argument that API uses "Choose Energy," "I choose energy,"

10   and "chooseenergy.org" commercially in connection with some product or service, API would be

11   using these terms in their primary descriptive sense, not as trademarks.  The Lanham Act specifically

12   recognizes a descriptive fair use defense under the facts presented here, where a descriptive term

13   (i.e., "Choose Energy," "I choose energy," etc.) is "used fairly and in good faith only to describe the

14   goods or services of such party…"  15 U.S.C. §1115(b)(4).  Here, there is no question that API uses

15   "Choose Energy," "I choose energy," and "chooseenergy.org" in their primary descriptive sense to

16   encourage voters to "choose" pro-"energy" candidates.  While Plaintiff may own trademark rights in

17   its CHOOSEENERGY mark for energy brokerage services, such registration does not give Plaintiff

18   the unqualified right to stop all other uses of "Choose Energy" in their primary descriptive sense,

19   including API's use of the phrase as a political message to encourage voters to "choose" candidates

20   and laws that favor a sound "energy" policy.  *CG Roxane LLC v. Fiji Water Co. LLC*, 569 F. Supp.

21   2d 1019, 1034 (N.D. Cal. 2008) ("In the Ninth Circuit, a junior user is always entitled to use a

22   descriptive term in good faith in its primary, descriptive sense other than as a trademark.  The

23   defendant must prove that its use of the term is not as a trademark or service mark, that it uses the

24   term fairly and in good faith and that it only uses the term to describe its goods.") (citations omitted).

25           When Plaintiff selected a descriptive term as its trademark, it assumed the risk of others

26   being able to use it descriptively.  *Cosmetically Sealed Indus. v. Chesebrough-Pond's USA Co.*, 125

27   F.3d 28, 31 (2d Cir. 1997); *Century Theatres, Inc. v. Landmark Theatres Corp.*, 2000 U.S. Dist.

28   LEXIS 10693, *10-11 (N.D. Cal. Apr. 12, 2000) (holding that "a trademark is not an absolute

property right because trademark law recognizes a 'fair use' defense to others' use of the mark");
*Bell v. Harley Davidson Motor Co.*, 539 F. Supp. 2d 1249, 1261 (S.D. Cal. 2008) (finding that
defendant's use of the phrase "Ride Hard" in motorcycle advertisements was descriptive fair use as a
matter of law and thus did not infringe plaintiff's federally registered RIDE HARD mark for
apparel); *Wonder Labs, Inc. v. Procter & Gamble Co.*, 728 F. Supp. 1058, 1064 (S.D.N.Y. 1990)
(even though plaintiff owned a federally registered mark for DENTISTS CHOICE for toothbrushes,
defendant's use of the phrase "the dentist's choice" for toothpaste was permissible because the
words were used in their primary descriptive sense to describe an important attribute of the
defendant's product—that it is recommended by dentists).

    Plaintiff argues is that API's "Choose Energy" phrasing is prominent and so must be a
trademark. (Dkt. No. 4 at 10-11 of 24)  However, prominence of the wording is not enough to
convert descriptive language to trademark usage.  Rather, trademark use requires that the mark be
used to identify and distinguish goods and services; mere emphasis of certain words or attention-
grabbing stylization is insufficient to show trademark use.  *Webceleb, Inc. v. Procter & Gamble Co.*,
554 F. App'x 606, 608 (9th Cir. 2014) (unpublished opinion) ("The use of 'web celeb' as part of a
stylized 'button' and a headline on defendants' online magazine is also not a trademark use.  Rather,
defendants' use of 'web celeb' was merely descriptive of the magazine's content.") *See also Eli Lilly
and Co. v. Revlon, Inc.*, 577 F. Supp. 477 (S.D.N.Y. 1983).  In *Eli Lilly and Co. v. Revlon, Inc.*, the
court held that Revlon's use of the words "lip repair cream" was not trademark use despite the fact
that the words were written in large letters across the product's packaging.  The *Revlon* court
explained that descriptive words may be purposefully stylized in a fashion meant to draw consumer
focus, but such stylization does not make the descriptive words trademarks:  "'Whatever attention is
drawn to [these descriptive words] serves only to inform the prospective purchaser what type of
[good] is contained within, not whose product it is.'"  577 F. Supp. at 486 (citing *Schmid
Laboratories v. Youngs Drug Products Corp.*, 482 F. Supp. 14, 20-21 (D.N.J. 1979).

### 3.    Plaintiff Is Unlikely to Establish a Likelihood of Confusion

    To the extent API's issue-advocacy is found to be commercial in nature and API's use of the
phrase "Choose Energy" does not qualify as descriptive fair use, Plaintiff is still likely to fail on the

API'S OPP'N TO MOTION FOR TRO
Case No. 5:14-cv-04557-PSG

merits of its trademark infringement claim because no likelihood of confusion exists.  In evaluating

the likelihood of confusion, courts in the Ninth Circuit employ the eight-factor test set forth in *AMF,*

*Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979).  The eight factors are (1) strength of

the mark; (2) proximity of the goods; (3) similarity of the marks; (4) evidence of actual confusion;

(5) marketing channels used; (6) type of goods and the degree of care likely to be exercised by the

purchaser; (7) defendant's intent in selecting the mark; and (8) likelihood of expansion of the

product lines.  As discussed below, each of these factors either weighs in API's favor or is neutral.

### a.   Plaintiff's CHOOSEENERGY Mark Is Weak and Entitled to an Extremely Limited Scope of Protection

A mark's inherent strength is measured "in terms of its location along a continuum stretching

from arbitrary, inherently strong marks, to suggestive marks, to descriptive marks, to generic,

inherently weak marks."  *Miss World (UK), Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445 (9th

Cir. 1988) ("The scope of protection afforded a strong mark is greater than that afforded a weak

one.").  Significantly, even if a mark is registered and has become "incontestable" under 15 U.S.C. §

1065, such fact "does not establish… that it is a particularly strong mark."  *Miss World*, 856 F.2d at

1447.  A court must still evaluate the mark's inherent strength, which in the Ninth Circuit is done by

using the "imagination test" and the "need test":

> We apply the "imagination test" and the "need test" to determine the
> strength of a mark.  The imagination test asks how much imagination a
> consumer must use to associate a given mark with the goods or
> services it identifies.  …The "need test" approaches the problem from
> the opposite end.  It asks to what extent a mark is actually needed by
> competitors to identify their goods or services.  If the message
> conveyed by the mark about the goods or services is so direct and clear
> that competing sellers would be likely to [need to] use the term in
> describing or advertising their goods [or services], then this indicates
> the mark is descriptive.

*Id.* at 1449 (citations omitted).

According to Plaintiff, it uses its CHOOSEENERGY mark in connection with brokerage

services on "a website for consumers to select their ideal energy supplier."  (Dkt. No. 4 at 17 of 24.)

In other words, Plaintiff uses its CHOOSEENERGY mark for services that allow consumers to

"choose" an "energy" supplier.  Little if any imagination is required to make this association.

- 11 -

Likewise, competitors in the energy brokerage industry would likely need to use the terms "choose energy" (or some form thereof) to describe or advertise their services.  These facts indicate that CHOOSEENERGY is not a strong mark.  *Miss World*, 856 F.2d at 1448 (where district court "found the mark's imagination aspect low and its need aspect high," the Ninth Circuit affirmed, holding "[t]hese are indications of a not strong mark").

Indeed, a preliminary review of U.S. Patent and Trademark Office records reveals that a number of third parties in the energy industry do, in fact, use marks containing the terms "choose" (or the variation "choice") and "energy."  Moreover, this evidence shows that other businesses which offer services similar  to Plaintiff's were using such marks before Plaintiff's claimed first use date.

| Mark | Reg. No. / First Use | Goods/Services | Owner |
|---|---|---|---|
| CHOOSE THE RIGHT TEAM.  CHOOSE AEP ENERGY | 4363792 9/1/2012 | Retail electricity provider services that allow customers to purchase electricity | American Electric Power Company, Inc. |
| GREENPOWERTOMORROW CHOOSE RENEWABLE ENERGY TODAY | 3467620 11/30/2007 | Public utility services in the nature of renewable energy distribution | Madison Gas and Electric Co. |
| CHOICE! ENERGY | 3307343 1/1/1994 | Energy brokerage services | CHOICE! Energy Services Retail, LP |
| YOUR ENERGY YOUR CHOICE | 3559919 4/2/2007 | Energy management services, namely, providing a service that allows customers to purchase energy, namely, electricity, natural gas and renewable energy; providing business marketing information in the fields of electricity, natural gas and renewable energy for others | Gateway Energy Services Corp. |

(Decl. of B. Brett Heavner ¶ 7, hereinafter "Heavner Decl.")

These federally registered third-party marks confirm that Plaintiff's CHOOSEENERGY mark is weak and exists among a crowded field of similar marks, where "each member of the crowd is relatively 'weak' in its ability to prevent use by others in the crows." *Miss World*, 856 F.2d at

1   1448 ("Simply put, a mark which is hemmed in on all sides by similar marks on similar goods

2   cannot be very 'distinctive'.  It is merely one of a crowd of marks.  In such a crowd, customers will

3   not likely be confused between any two of the crowd and may have learned to carefully pick out one

4   from the other.").

5           Finally, the limited evidence of commercial strength put forward by Plaintiff (i.e., 200,000

6   visitors to Plaintiff's website monthly and $5 million in advertising over the past five years) is not

7   sufficient to establish that its mark is strongly associated with the Plaintiff among the relevant

8   consumers, particularly given the inherently weak nature of Plaintiff's mark, as discussed above.

9   *Quia Corp. v. Mattel, Inc.*, 2010 U.S. Dist. LEXIS 68237, *15-16 (N.D. Cal. June 15, 2010) (finding

10  no likelihood of confusion between plaintiff's federally registered IXL mark, which plaintiff

11  admitted suggests "I excel," and defendants' iXL mark; conflicting evidence with respect to

12  conceptual strength and limited evidence of commercial strength led court to conclude that

13  plaintiff's mark "deserves only moderate protection"); *Water Pik, Inc. v. Med-Systems, Inc.*, 726

14  F.3d 1136, 1154-1155 (10th Cir. 2013) (evidence that plaintiff's products "had millions of users"

15  and had appeared once on the Oprah Winfrey Show was not sufficient to establish that plaintiff's

16  "Sinu*Cleanse*" mark for a sinus-cleansing product was commercially strong).

17          Accordingly, the "strength of the mark" factor weighs strongly in API's favor.

18          **b.      The Parties Do Not Offer Any Related Services**

19          To the extent API's issue advocacy activities are deemed to be a type of "service" (which

20  they should not for the reasons discussed above), those "services" would clearly be unrelated to

21  Plaintiff's energy brokerage services.  Besides the fact that both types of "services" could be said to

22  be broadly related to the energy industry, they have nothing else in common.  *Therma-Scan, Inc. v.*

23  *Thermoscan, Inc.*, 295 F.3d 623 (6th Cir. 2002) ("Goods or services are not necessarily related,

24  however, simply because they coexist in the same broad industry."); *Quia Corp. v. Mattel, Inc.*, 2010

25  U.S. Dist. LEXIS 68237, *15-16 (N.D. Cal. June 15, 2010) (finding that the connection between

26  defendants' iXL handheld device and Plaintiff's online-only state standards-based math practice

27  software, which were both designed to help children learn in some capacity, was "attenuated" and

28  weighing this factor against the plaintiff).

As in *Quia*, the relationship between API's political messaging activities to garner support for pro-energy candidates and Plaintiff's energy brokerage services is attenuated at best. The "proximity of the goods" factor therefore weighs strongly in API's favor.

c.   **When Viewed in Context, API's Use of "Choose Energy," "I Choose Energy," and "chooseenergy.org" as a Issue Advocacy Tool Is Not Similar to Plaintiff's CHOOSEENERGY Mark**

The similarity of marks is assessed in terms of their sight, sound, and meaning. *Sleekcraft*, 599 F.2d at 351. Even where marks may have certain facial similarities, slight differences can be sufficient to distinguish them if they exist in a crowded field, the plaintiff's mark is otherwise weak, or there are contextual differences between the respective uses. *Miss World*, 856 F.2d at 1448 (affirming district court's conclusion that MISS WORLD is sufficiently dissimilar in sight, sound, and meaning from MRS. OF THE WORLD when examined in the crowded field of the beauty pageant industry); *Quia Corp.*, 2010 U.S. Dist. LEXIS 68237 at *23-24 (while "the two marks [IXL and iXL], set side-by-side and isolated from the respective contexts in which they appear to consumers, are strikingly similar… when viewed as they appear in the marketplace… the marks are far less similar and therefore far less likely to confuse the reasonably prudent consumer"; court found the similarity factor to be neutral) (citations omitted).

Here, the contextual differences between Plaintiff's use of CHOOSEENERGY and API's use of the phrases "Choose Energy" and "I choose energy" are significant, and those differences impart substantially different meanings to shared terms. Specifically, Plaintiff uses its CHOOSEENERGY mark in connection with this explanatory wording on its home page: "We guide you through your options in deregulated energy markets and let you <u>choose</u> the <u>energy</u> supplier that's right for you." (Heavner Decl. ¶ 8) (emphasis added). As such, the intended meaning of Plaintiff's mark is to connote Plaintiff's energy brokerage services which allow consumers to "choose" their "energy" supplier. In contrast, API uses "Choose Energy," "I choose energy," and "chooseenergy.org" as part of its issue-advocacy activities. Significantly, API emphasizes the political nature its advocacy by placing the words "Choose Energy" inside the image of a campaign button with a traditional✓ symbol, clearly emulating a ballot. Moreover, the wording is accompanied by the text "THIS

1    ELECTION, Americans have the opportunity to choose candidates who support energy policies that

2    create jobs, enhance our energy security and establish America as a global energy leader."  Rozett

3    Decl. ¶ 12.  In this context, the term "choose" does not mean "select" or "purchase" an electricity

4    provider as it does in Plaintiff's mark, but means "vote for" to convey the message that people

5    should vote in accordance with specific consideration of energy issues.

6         As such, even though the parties use common terms, those terms have very different

7    meanings when considered in context.  As in *Quia* which involved the marks IXS and iXS, the

8    similarity factor here should be considered neutral.

9                     **d.      The Fact That Both Parties Utilize the Internet**
                              **Is Not Sufficient to Find That the Marketing**
10                            **Channels Are the Same or That Consumers Will**
                              **Not Exercise Care**
11

12        Contrary to Plaintiff's assertions, the fact that API has used the Internet (as one of a number

13   of mediums) to spread its political messaging and that Plaintiff also advertises its electricity

14   brokerage services on the Internet is insufficient to conclude that the parties' marketing channels are

15   the same.  *Quia Corp.*, 2010 U.S. Dist. LEXIS 68237, *27 ("Though both products are marketed and

16   sold on the Internet, this fact, without more, is insufficient to demonstrate that this factor supports a

17   finding of consumer confusion.").  Because Plaintiff presented no evidence of market channel

18   overlap other than the Internet, this factor should be considered neutral.

19        Similarly, Plaintiff's argument that "internet consumers" do not use care contravenes recent

20   Ninth Circuit law.  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1152

21   (9th Cir. 2011) (finding the district court's determination that Internet users generally exercise a low

22   degree of care to be in error, stating that in many contexts this no longer holds true and holding "that

23   the default degree of consumer care is becoming more heightened as the novelty of the Internet

24   evaporates and online commerce becomes commonplace"); *see also Herbalife Int'l, Inc. v. Lumene*

25   *N. Am. LLC*, CV 07-5040 AHM (RCX), 2007 WL 4225776 (C.D. Cal. Oct. 15, 2007) (finding that

26   "nothing about the online experience" affects the degree of care used).

27        Moreover, Internet users—i.e., virtually everyone—is not an appropriate universe of

28   consumers.  Rather, the inquiry must be made with respect to those who are or potentially might be

- 15 -

purchasers of the products in question.  *Rearden LLC v. Rearden Commerce, Inc.*, 683 F.3d 1190,

1214 (9th Cir. 2012) ("We also recognize that a court conducting a trademark analysis should focus

its attention on the relevant consuming public."); *Accuride Int'l, Inc. v. Accuride Corp.*, 871 F.2d

1531, 1535 & n. 5 (9th Cir. 1989) (explaining that "likelihood of confusion" analysis must remain

focused "upon confusion in the marketplace, as opposed to generalized public confusion," and that

"[u]nless prospective purchasers of AII's goods are confused, there is ... no cause of action").

Here, the relevant consumers are likely to be sophisticated and discerning.  According to

Plaintiff's website, Plaintiff's customers and potential customers are homeowners and business who

are considering switching from traditional energy providers to deregulated energy markets, and then

actually doing so if they determine that is right for them.  This process requires time, motivation,

thoughtfulness, and money, and is likely done infrequently.  It is unlikely that a home or business

owner would make such a change without exercising due care.  Similarly, voters who visit API's site

are sophisticated and conscientious citizens who are diligently researching election issues and

positions prior to casting their ballots.  Moreover, they cannot purchase anything on the API website.

So, a consumer looking to purchase electricity from an unregulated energy market is not likely to be

satisfied by the API chooseenergy.org website.  Because both Plaintiff and Defendant reach

sophisticated audiences, the degree of care factor favors API.

> **e.   Plaintiff's Evidence of Actual Confusion Is Based Entirely
>        on Hearsay, Is Highly Unreliable, and Should Be Accorded
>        No Weight**

Plaintiff's "estimate" that its customer service representatives have encountered

"approximately one hundred" instances of confusion is supported only by the following statement

from its CEO:

> Choose Energy does not record every call received at its call center, so
> Choose Energy does not know the exact number of customers
> confused about Choose Energy's affiliation or association with API.  I
> have reviewed reports from customer service representatives and
> interviewed other employees responsible for interfacing with our
> consumers.  Based on these reports and interviews, Choose Energy
> estimates that its customer service representatives—including those
> managing its call center, online customer chat interface, and Twitter
> account—have encountered approximately one hundred instances of
> consumers who have contacted Choose Energy after being confused

1

2

by API's advertising and mistakenly believed that Choose Energy was affiliated or associated with API's "Choose Energy" campaign. (Representative examples of this consumer confusion are attached hereto as Exhibit 4.)

3

4

(Dkt. No. 6 at 5 of 7, ¶14.)

5

Despite this statement, Plaintiff has not provided any of the mentioned reports or interviews,

6

submitted any declarations from the actual customer service representatives who allegedly

7

encountered these instances of confusion, or submitted any declarations from the allegedly confused

8

consumers.  Plaintiff has not even identified the alleged representatives or consumers.  Given

9

Plaintiff's reliance on its "evidence" of actual confusion and the fact that actual confusion is

10

Plaintiff's primary basis for claiming irreparable harm, the absence of any such corroborating

11

evidence is striking—all the more so in view of the fact that the first alleged instance of alleged

12

actual confusion came to light in early September, giving Plaintiff ample time to assemble such

13

evidence.  Contrary to the "approximately one hundred instances" of confusion Plaintiff alleges, it

14

has provided "evidence" of only three instances—an Internet chat transcription and two Twitter

15

posts.  Again, none of these are supported by declarations from the actual parties involved, even

16

though one of the parties in each instance appears to have been someone who worked for Plaintiff.

17

Even assuming this evidence is accorded any weight, with respect to the chat transcription,

18

nothing in it references API, either explicitly or implicitly.  The anonymous customer simply asks

19

Plaintiff's customer service representative whether Plaintiff is a politically partisan organization.

20

When the representative responds by saying "We are unable to discuss politics," the customer jumps

21

to the conclusion that *Plaintiff* must be politically partisan.  Importantly, API is a non-profit, *non-*

22

*partisan* entity organized under United States Internal Revenue Code Section 501(c)(6).  API does

23

not advocate for or against any particular candidate based on their party affiliation.  Rather, API

24

educates voters and advocates on issues related to the petroleum industry.  Rozett Decl. ¶¶ 3-4)

25

The two Twitter posts, where the pseudonymous users likewise do not reference API, are

26

even less probative.  Like the chat discussed above, neither "Uncle G2 in PA" or "Gosh Andrews"

27

refer to API or discuss any issue at all. Without declarations from these alleged consumers to

28

API'S OPP'N TO MOTION FOR TRO
Case No. 5:14-cv-04557-PSG

indicate why they wrote what they wrote, Plaintiff cannot meet its burden of proof.  Nothing on the face of these exchanges indicates any type of actionable consumer confusion.

At most, these three instances are "weak, hearsay evidence of confusion by a few people" and should be given minimal weight.  *Miss World (UK), Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir. 1988) (affirming district court's conclusion that such evidence was "unconvincing"); *see also Delphon Indus., LLC v. Int'l Test Solutions Inc.*, 2011 U.S. Dist. LEXIS 119588, 9-10 (N.D. Cal. Oct. 17, 2011) ("Although a district court may consider hearsay in deciding whether to issue a preliminary injunction, the court remains free to give less weight to such evidence because it is less reliable.");  *see also QVC Inc. v. Your Vitamins Inc*., 439 F. App'x 165, 168-69 (3d Cir. 2011) (unpublished decision) (affirming the denial of a preliminary injunction motion and finding "sixty-odd" internet comments evincing confusion of "limited value" because the comments were not abundant, may not be genuine, may not be made in good faith, or the user would fall in to the universe of consumers whose opinions are not relevant).

Even assuming these three instances indicate some minimal confusion occurring in the marketplace, the Supreme Court has recognized that some level of confusion can be tolerated where the plaintiff has chosen a mark consisting of descriptive terms, as Plaintiff has done here:

> The common law's tolerance of a certain degree of confusion on the part of consumers followed from the very fact that in cases like this one an originally descriptive term was selected to be used as a mark, not to mention the undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first.  The Lanham Act adopts a similar leniency, there being no indication that the statute was meant to deprive commercial speakers of the ordinary utility of descriptive words.  If any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase.

*KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111, 122 (2004) (citations omitted); *see also Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.*, 469 U.S. 189, 201 (1985) (noting that the Lanham Act contains safeguards to prevent the commercial monopolization of language).

The "evidence of actual confusion" factor should accordingly favor API.

1

2

                    **f.    API Had No Intent to Capitalize on Plaintiff's Reputation
                           or to Confuse Consumers**

3              Under the facts, it belies common sense to argue that API adopted its "Choose Energy"

4   "I choose energy" messaging to capitalize on any goodwill that Plaintiff ("a small company," in

5   Plaintiff's own words, *see* Dkt. No. 4 at 21 of 24) has in its CHOOSEENERGY trademark for

6   energy brokerage services.  As discussed above, Plaintiff uses "Choose Energy" and "I choose

7   energy" descriptively as issue-advocacy terms to persuade voters to "choose" pro-"energy"

8   candidates in the November 2014 election.  API's political messaging has nothing to do with

9   Plaintiff's energy brokerage services and API would stand to gain nothing by associating itself with

10  a trademark used for such services.  The mere fact that API had constructive notice of Plaintiff's

11  federal registration is insufficient to establish bad faith.  *Quia Corp.*, 2010 U.S. Dist. LEXIS 68237,

12  *25 (finding that even though defendants were on constructive notice of plaintiff's registration, this

13  factor did not weigh in plaintiff's favor).  The descriptive nature of the terms at issue further

14  underscores that API had no intent to confuse or deceive consumers.  *Delphon Indus., LLC v. Int'l*

15  *Test Solutions Inc.*, 2011 U.S. Dist. LEXIS 119588, *24 (N.D. Cal. Oct. 17, 2011) ("In light of the

16  descriptive nature of the word 'probe' to materials that clean probes, ITS Nevada has failed to show

17  Delphon chose this name to confuse or deceive customers.").

18             The "defendant's intent in selecting the mark" factor should therefore favor API.

     **B.      Plaintiff Will Not Suffer Irreparable Harm**

19             As discussed in the introduction, Plaintiff's own actions amply demonstrate that Plaintiff

20  itself does not believe it will suffer irreparable harm through API's use of the "I choose energy"

21  message until the upcoming November election.  Regardless, irreparable harm may not be presumed

22  upon a showing of reasonable likelihood of success on the merits, but must be independently proven.

23  *See eBay, Inc. v. MercExchange, LLC*, 547 U.S. 388 (2006); *Kerr Corp. v. North Am. Dental*

24  *Wholesalers, Inc.*, 2011 U.S. Dist. LEXIS 61779, at *6-7 (C.D. Cal. June 9, 2011) (holding that a

25  presumption of irreparable harm upon a showing of likelihood of success on the merits "no longer

26  applies" in light of the Supreme Court's decision in *eBay* and that plaintiff "cannot evade its burden

27  to demonstrate a likelihood of irreparable injury even if it established a likelihood of success on the

28  merits"); *Aurora World, Inc. v. TY Inc.*, 719 F. Supp. 2d 1115, 1168 (C.D. Cal. 2009) ("[T]he court

                                          - 19 -

1   finds persuasive the reasoning of numerous district courts that have disregarded the presumption [of

2   irreparable harm] in preliminary injunction proceedings."); *Skydive Ariz., Inc. v. Quattrocchi*, 2010

3   U.S. Dist. LEXIS 49972, 3-4 (D. Ariz. Apr. 26, 2010) ("In light of the Supreme Court's decision in

4   *eBay*, many district courts have ceased this practice, refusing to afford plaintiffs a presumption of

5   irreparable harm.") (citations omitted).

6          Armed with no evidence of damage, irreparable or otherwise, Plaintiff relies on speculative

7   and unsubstantiated allegations that API's issue-advocacy has caused actual confusion.  As

8   discussed above, however, these allegations are supported only by the slimmest of reeds, i.e., three

9   instances of weak, anonymous hearsay evidence which do not even mention API.  *Delphon Indus.*,

10  2011 U.S. Dist. LEXIS 119588 at *9-10 ("A plaintiff must demonstrate that irreparable harm is real

11  and significant, not speculative or remote.").  Plaintiff offers no financial information, evidence of

12  lost sales, consumer statements, studies, or empirical evidence of any kind to support its claim of

13  irreparable harm.  Courts routinely deny TROs and preliminary injunctions where, as here, the

14  movant fails to submit "proof of special circumstances justifying the extraordinary relief of an

15  injunction prior to trial."  *Nutrition 21 v. United States,* 930 F.2d 867, 871 (Fed. Cir. 1991).

16         Even assuming some minimal harm to Plaintiff from these three instances of alleged

17  confusion, such harm is extremely limited in scope and thus compensable in the form of money

18  damages—particularly given that API already intends to cease its "Choose Energy" political

19  messaging soon after election day (now just eight days away).  *Delphon Indus.*, 2011 U.S. Dist.

20  LEXIS 119588, *9-10 ("The possibility that adequate compensatory or other corrective relief will be

21  available at a later date, in the ordinary course of litigation, weighs heavily against a claim of

22  irreparable harm.").  Should Plaintiff ultimately succeed on the merits, it can try and prove those

23  damages.

24         Plaintiff's claim of irreparable harm is significantly undermined by its delay in filing this

25  motion.  API's "Choose Energy" messaging has been going on for almost a year, and the first

26  instance of alleged actual confusion came to Plaintiff's attention *over seven weeks ago*.  (HEAVNER

27  Decl. ¶ 3)  Further the timing of the filings and communications between Plaintiff and API prove

28  that this is not a case upon which a TRO can be issued.

1    As indicated, API first began using these phrases in January, 2014.  (ROZETT Decl. ¶ 5)

2  Plaintiff admits to knowledge of the phrases on September 7.  (COMPLAINT ¶ 9) Curiously,

3  Plaintiff fails to state whether this is the first knowledge it had of API's use of these phrases.  The

4  initial communication Plaintiff had with API occurred on September 19.  (HEAVNER Decl. ¶ 3)

5  More than seven weeks pass between the time of this initial communication and the day the

6  complaint was filed.

7    And, although Plaintiff was in consistent contact with API's counsel since mid-September,

8  Plaintiff does not forward a courtesy copy of the Complaint to counsel until five days after it filed

9  the Complaint.  (HEAVNER Decl. ¶ 4).   And, a two week delay occurred between the filing of the

10  complaint and the preparation of the Motion.

11    The service, both formal and informal of the Motion is also suspect.  Plaintiff arranged for

12  service of the Motion and the Complaint on API's agent for service of process (in Los Angeles) on

13  Friday, October 24, 2014.  Logically, that means that the Motion was completed much earlier.  Yet,

14  Plaintiff waited until 7:42 PM on Friday evening to send this Motion to API's counsel, knowing it

15  had set a hearing on this Motion for two business days thereafter.  (HEAVNER Decl. ¶ 6)

16    These delays, particularly in light of a Motion for Temporary Restraining Order are

17  inexcusable.  *United Tactical Systems, LLC v. Real Action Paintball, Inc.,* 2014 U.S. Dist LEXIS

18  142864, at *8 (No. Dist. Cal. October 6, 2014) If Plaintiff were truly suffering irreparable harm,

19  these days would not have occurred.   Because Plaintiff has shown no urgency, its motion should be

20  denied.  *See Marin Alliance For Med. Marijuana v. Holder*, 866 F. Supp. 2d 1142, 1160 n.11 (N.D.

21  Cal. 2011) (where plaintiff delayed "over a month" in moving for a TRO and preliminary injunction,

22  the motion was denied because plaintiff's claim of irreparable harm was contravened by the delay);

23  *Givemepower Corp. v. Pace Compumetrics, Inc.*, No. 07CV157WQHRBB, 2007 WL 951350 (S.D.

24  Cal. Mar. 23, 2007) ("Plaintiff's [two-month] delay in seeking injunctive relief undercuts its current

25  argument of immediate, irreparable harm.").

26

27

28

**C.      The Balance of Hardships Tips Sharply in API's Favor**

To determine which way the balance of hardships tips, "a court must identify the possible harm caused by the preliminary injunction against the possibility of the harm caused by not issuing it."  *Bayer Corp. v. Roche Molecular Sys.*, 72 F. Supp. 2d 1111, 1120 (N.D. Cal. 1999) (citing *Los Angeles Memorial Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1203 (9th Cir.1980)).  Here, Plaintiff asks this court to severely restrain API's First Amendment rights to political speech during the critical week before Election Day.[2]  As noted by the Supreme Court in *Mills v. Alabama* when overturning an Alabama law that prohibited publishing editorials on Election Day.

> Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs.  This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes. . . .  It is difficult to conceive of a more obvious and flagrant abridgment of the constitutionally guaranteed freedom of the press.

384 U.S. 214, 218-19 (1966).   The relief requested by Plaintiff here—to curtail API's right to publish its viewpoints to voters days before Election Day—is not materially different than the speech restrictions the Supreme Court rejected in *Mills,* and accordingly should be similarly rejected.[3]

By comparison, any harm to Plaintiff is minimal given that API has already agreed to cease the messaging at issue after November 4, 2014 (i.e., in another eight days), and any limited harm that Plaintiff may suffer would be compensable in the form of money damages.  Indeed, the fact that Plaintiff is not suffering any irreparable harm is evidenced by the fact that Plaintiff offered to allow

---

[2] Although Plaintiff is a private party, its action against API implicates the First Amendment because the relief it seeks, if granted, is considered government action subject to First Amendment scrutiny. *Shelley v. Kraemer*, 334 U.S. 1, 14-15 (1948); *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 418 (1971).

[3] API also adopts and includes by reference all of the arguments it makes in the concurrently filed Defendant American Petroleum Institute's Notice and Special Motion to Strike Pursuant To C.C.P. § 425.16.

API to continue its "Choose Energy" messaging through November 4, 2014 in return for a substantial monetary payment.  (Heavner Decl..¶)

**D.      Public Policy Does Not Favor A TRO or Injunction in This Case**

Finally, it would not be in the public interest to grant the extreme relief Plaintiff requests.  A TRO or injunction would be wholly disproportionate to Plaintiff's proof.  It would serve only to deprive voters of hearing API's viewpoints in the critical week before Election Day, by itself a violation of the First Amendment.  *Pacific Gas & Elec. Co. v. Public Util. Comm'n*, **475 U.S. 1,  8 (1986)** ("The constitutional guarantee of free speech 'serves significant societal interests' wholly apart from the speaker's interest in self-expression. *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 776 (1978). By protecting those who wish to enter the marketplace of ideas from government attack, the First Amendment protects the public's interest in receiving information.") Plaintiff's motion should therefore be denied as against the public interest.

**III.   PLAINTIFF'S FAILURE TO COMPLY  FAILS TO COMPLY WITH FED. R. CIV. 65(C)**

Federal Rule of Civil Rule 65(c) requires any parting seeking a temporary restraining order to post a security to if the order is issued.  Plaintiff's motion is silent on its bond obligation, and does not propose what, if any, security it is prepared to post.  In light of the weak evidence proffered by Plaintiff, the lack of harm to Plaintiff, and the grievous harm to API and the public should API be restrained from advocating its positions to voters eight days before Election Day, API requests that should the court grant Plaintiff's motion, it also require the posting of a substantial bond to compensate API for the damages it will sustain because it was wrongfully enjoined and restrained from speaking. Accordingly, API hereby requests that the court order Plaintiff to post a bond of not less than $3,000,000.

**IV.   PLAINTIFF'S REQUEST FOR A HEARING ON OCTOBER 28, 2014 DOES NOT COMPLY WITH THE LOCAL RULES AND SHOULD BE DENIED**

Plaintiff's request for a hearing on October 28, 2014 does not comply with NDCA civil local rule L.R. 7-2, which requires a 35 day notice period for a motion.   Plaintiff's noticing the hearing for October 28 (2 business days after service) fails to adhere to this local rule.  Plaintiff's Motion

1  apparently attempts to seek an ex parte TRO.  However, the Motion fails to cite or refer to the Civil

2  Local Rule under which such a procedure is even possible.  Judge Armstrong recently denied a

3  similar request, commenting that "Plaintiff's TRO Application does not mention Civil L.R. 65-1…"

4  *Eichner v. Bank of America,* 2013 U.S. Dist. LEXIS 118984, *8 (N. D. Cal. August 20, 2013).

5        Thus, this Motion should be treated as a Motion pursuant to Civil L.R. 7, which requires a 35

6  day notice period.  Even if procedurally, Plaintiff is found to have complied with the Civil Local

7  Rules, the facts as discussed above fail to support the drastic TRO remedy.

8  **V.     CONCLUSION**

9        For any one of the multiple reasons given above, Plaintiff's motion for a TRO should be

10 denied in its entirety.  If the Court is not inclined to deny Plaintiff's motion or elects to treat

11 Plaintiff's motion as a motion for a preliminary injunction, API requests an evidentiary hearing and

12 that it be given at least sixty (60) days to take limited discovery and fully develop its various

13 defenses as set forth above.  At a minimum, API would need to take the deposition of Kerry Cooper

14 (Plaintiffs' CEO) concerning the matters set forth in his declaration and investigate the alleged

15 instances of actual confusion and alleged damages.

16 Dated:  October 27, 2014

Respectfully submitted,

17                                     FINNEGAN, HENDERSON, FARABOW
                                       GARRETT & DUNNER, L.L.P.

18

19                                     By:_____*/s/ Scott R. Mosko*_____
                                            Scott R. Mosko

20                                     Attorneys for AMERICAN PETROLEUM
                                       INSTITUTE

21

22

23

24

25

26

27

28